ZILLMER, Plaintiff in error, v. STATE, Defendant in error.

*Nos. State 13, 14. Argued June 5, 1968.—Decided June 28, 1968.*
(Also reported in 159 N. W. 2d 669.)

608

For the plaintiff in error there was a brief and oral argument by *Robert H. Friebert,* public defender.

For the defendant in error the cause was argued by *E. Michael McCann,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *David J. Cannon,* district attorney.

WILKIE, J.   Before considering the issues presented by our review on the two writs of error, we set forth certain preliminary but pertinent facts.

The defendant, a twenty-three-year-old rookie police officer on the force of the Milwaukee police department, had been on duty from 12:01 a. m., until 8 a. m., on July 7, 1965. Following the completion of his shift, Zillmer's official duties required that he be in court until approximately 11 a. m. The defendant testified that between 11 a. m. on July 7, 1965, and 2 a. m. on July 8, 1965, he slept for a few hours, went to a dance lesson and party at the Fred Astaire dance studio, and visited several taverns. He consumed a substantial amount of bourbon and beer during this period.

There was a slight conflict in the testimony regarding precisely when and where Zillmer met Ray Schiller; however, it is clear that at approximately 2 a. m. they were together at a George Webb's restaurant near the corner of Thirty-fifth and Burleigh streets in Milwaukee.

Schiller testified that on July 7, 1965, he played tennis at Sherman Park until 10 p. m., and then proceeded to visit several taverns. Schiller and Zillmer had known each other for about two years. After Schiller and the defendant came together at around 2 a. m., Schiller purchased a six-pack of beer and invited Zillmer to his home. Zillmer accepted the invitation and the two drove off in the Zillmer car to the Schiller home.

Zillmer parked his car in front of the Schiller home and both men proceeded to the back garage where they opened their beer and engaged in conversation. They left the garage shortly thereafter and returned to Zillmer's car. Schiller carried two hammers with him. Zillmer saw Schiller carrying the hammers. They drove to a Clark service station on Fifty-first and Hampton. Zillmer pulled onto the station drive and parked the car. Zillmer sat behind the wheel and Schiller walked into the station carrying a hammer. The station attendant, nineteen-year-old Charles Erwin, testified that Schiller attempted to rob him but was thwarted because Erwin recognized Schiller. Schiller, carrying the hammer, returned to the car, entered it, and Zillmer drove away.

They then proceeded to a Standard Oil Service station located at Sixtieth and Fond du Lac. Schiller and Zillmer both stepped from the car immediately upon arrival at the station. Schiller had a hammer on his person. Schiller went inside the station to the men's room. Zillmer went around the corner of the station to the women's rest room. After Schiller came out of the men's room, he hit the station attendant with the hammer, knocked him down, and informed him that this was a holdup. The attendant, Gordon LaPan, surrendered some money to Schiller and then Schiller ordered him into the men's room. Schiller did not strike LaPan a second time because LaPan pleaded for mercy. Zillmer, who was apparently in the ladies' room, was not physically present during the actual holdup. Schiller and Zillmer climbed into the car and Zillmer drove away from the station. At approximately 3:35 a. m. (just a few minutes later), the duo's automobile was stopped by a police squad car. All the money, approximately $107, was found under the floor mat on the passenger's side of the car where Schiller was sitting.

Although the foregoing events are undisputed, just what was observed and known by Zillmer about the robbery and what was said by Schiller to Zimmer is in sharp conflict. Both were charged with robbery. Schiller pleaded guilty and was sentenced to ten years in prison. Zillmer pleaded not guilty. He received a jury trial and following his conviction he was sentenced to eight years in prison. Zillmer's guilt depends on his knowing involvement in the robbery.

Five issues are presented:

(1) Should the conviction be set aside because a principal witness for the state executed affidavits subsequent to the trial which contained allegations that materially conflicted with his testimony at the trial?

(2) Is the conviction supported by sufficient evidence?

(3) Should the conviction be reversed and a new trial ordered in the interest of justice?

(4) Did prejudicial error occur when the prosecuting attorney misstated the testimony of a witness during the cross-examination of the defendant?

(5) Should this court order a new hearing on the defendant's postconviction motions?

1. *Effect of witness' postconviction affidavits containing statements conflicting with his trial testimony.* Zillmer's conviction depends largely on the credibility of two witnesses: Zillmer and Schiller. Zillmer repeatedly denied any participation in the robbery. At the trial Schiller implicated Zillmer. He had given three earlier statements—the first about two hours after his arrest in which he admitted his part in the armed robbery and at the same time cleared the defendant. About an hour later Schiller wrote a new statement which changed his earlier statement and implicated Zillmer. A third statement, given on interrogatories approximately one-half hour later, also implicated Zillmer.

After both men were convicted, Schiller executed two sworn affidavits on November 1, 1966, which counsel contends recant his testimony against Zillmer.

We have examined Schiller's extensive trial testimony. Our review discloses that excerpts from this voluminous transcript indicate several inconsistencies in Schiller's testimony regarding whether or not he and Zillmer discussed robbing the Clark station on Fifty-first and Hampton. However, the record clearly reveals that, with the exception of the initial statement to police, Schiller's testimony is consistent that a robbery of the second station was discussed. Schiller admitted that his initial statement was untrue. Schiller's explanation for making the untrue statement seems very plausible—he wanted to cover up for Zillmer. Despite minor discrepancies regarding the exact content of Schiller's discussions with Zillmer concerning the second gas station, the import is clear. According to Schiller, Zillmer knew that a robbery was about to be perpetrated.

Zillmer's observation of Schiller getting into Zillmer's car with two hammers after 2 a. m., the visit to two gas stations close in time and proximity to one another, Zillmer's initial admission (which was later denied) that he knew Schiller took a hammer into the first gas station, and the fact that Zillmer selected a longer route home that avoided passing a police station out of which investigating squad cars could be dispatched to the robbery scene, while not unequivocally indicative of guilt are surely compatible with guilt.

We have compared the trial testimony with the two allegedly recanting affidavits and with the testimony given at the special hearing ordered by the trial court.

In his first affidavit Schiller states:

"As we entered the Standard station I said to Bob, 'I think I'll rob this place.' He didn't say anything not even make a face."

Counsel interprets this affidavit as a repudiation by Schiller of his trial testimony regarding Zillmer's participation in the crime. A reading of this affidavit leaves us with only one clear impression—the affidavit is unclear.

Paragraphs 3, 4, and 5 of Schiller's second affidavit state:

"3. In court I testified that Robert Zillimer [sic] was part of the robbery. This statement is untrue because he was in the ladies room at the time and had no knowledge that a robbery was taking place.

"4. I had never discussed this with Zillimer [sic] early and his mind was a blank as to holding up a gas station. Also, I didn't tell him afterwards that I held the place up.

"5. In my testimony I said Zillmer was part of the robbery cause I thought that I would get of [sic] with a lighter sentence. I didn't expect him to get an eight year sentence. If so I wouldn't have involved him at all. He wasn't involved at all."

At the hearing, Schiller testified that he mentioned robbing the Standard station when they were about six

blocks away. He also testified that he said "I think I will rob this place," and that Zillmer was to "Draw his [the attendant's] attention." In all, Schiller's testimony at the hearing was in basic agreement with his trial testimony and a repudiation of whatever allegations were inconsistent in his affidavits. He testified that he did not wish to change any of the testimony given during the Zillmer trial. Schiller also attempted to explain isolated statements in the affidavits that could be interpreted as repudiations of his trial testimony. Schiller also indicated that he made certain allegations in the affidavit because he was trying to protect Zillmer.

Thus we are presented with a situation where a witness, who has testified to inculpate another at trial, files affidavits which contain statements that are apparently inconsistent with his trial testimony but which statements, on special hearing and under cross-examination, he repudiates and goes on to affirm his trial testimony. We can find no basis for disagreeing with the trial court's denial of postconviction relief in this case.

In the early case of *Loucheine v. Strouse* [1] the respondent submitted an affidavit to the trial court wherein a witness admitted committing perjury when testifying on material questions during the trial. The affidavit alleged that the witness would testify to the truth and in favor of the respondent at a new trial. This court, in reversing the order of the trial court which had granted respondent's motion for a new trial, stated:

". . . A judgment rendered regularly ought not to be set aside on the unsupported affidavit of an admitted perjurer that he will swear to the truth on another trial . . . ." [2]

Defendant distinguishes *Loucheine* because he intends to use the alleged changed story to impeach Schiller at

[1] (1880), 49 Wis. 623, 6 N. W. 360.

[2] *Id.* at page 625.

a new trial rather than use the changed story as affirmative evidence that Zillmer knew nothing of the robbery.

The difficulty with this position is, however, that unlike *Loucheine,* Schiller's testimony at the hearing clearly shows that he admits to no perjury during Zillmer's trial. If any false swearing was committed, it was in the postconviction affidavits. The reason for the untruths in the affidavits, which was the same reason advanced for giving the false initial statement to the police, was to protect Zillmer. This issue was thoroughly considered at the trial.

In *Wohlfert v. State* [3] this court faced a situation analogous to that presented by the instant case. In *Wohlfert,* the defendant was convicted of unlawfully selling moonshine liquor. A witness testified that he had arranged with the defendant for the sale and had paid $7 for the liquor. After conviction, the witness signed a statement which completely recanted his trial testimony. In denying a new trial, this court said:

". . . If verdicts are to be overturned every time a witness attempts to repudiate his testimony by signing a sworn statement, without opportunity to apply the test of cross-examination, judgments of courts will rest upon a very insecure foundation. Whenever it appears that judgments are procured by false testimony, courts should promptly set them aside. But we are impressed with the fact that this is not such a case. The record satisfies the court that justice has been done and that there is no ground for the granting of a new trial." [4]

The instant case presents an additional reason for letting the conviction stand—the affidavits have been repudiated.

In *Dunlavy v. Dairyland Mut. Ins. Co.* [5] this court reiterated the general rule that an admission of a witness

---

[3] (1928), 196 Wis. 111, 219 N. W. 272.

[4] *Id.* at pages 112, 113.

[5] (1963), 21 Wis. 2d 105, 124 N. W. 2d 73.

that he committed perjury upon the trial of a cause is not ground for a new trial based on newly discovered evidence. The court said the proper rule is that a new trial may be based upon an admission of perjury if the facts in the affidavit are corroborated by other newly discovered evidence.

*Dunlavy* is not applicable for several reasons. The alleged facts in Schiller's affidavits are uncorroborated. More importantly, however, the trial court in *Dunlavy* conducted a hearing on the affidavits and in granting a new trial must have relied on the veracity of the affidavits. In the instant case, however, the affidavits of Schiller were repudiated at the hearing before the trial court. Thus the *Dunlavy Case* is entirely inapplicable.

We commend the procedure employed by the trial court in holding a hearing following the submission of the two "recanting" affidavits of Schiller. This hearing permitted the state to cross-examine Schiller in the process of which Schiller reaffirmed his trial testimony and repudiated the affidavits. Such a procedure permits the trial court to inquire into the extent of the recantation before the conviction is reversed or a new trial ordered.

2. *Sufficiency of evidence.* This court has repeatedly held that "when the question of the sufficiency of the evidence is presented on appeal in a criminal case the only question for this court is whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendants' guilt beyond a reasonable doubt." [6] Applying that test to our review of the entire trial record, the two "recanting" affidavits, and the record of the postconviction hearing thereon, we are satisfied for the reasons heretofore set forth that the conviction is supported by a sufficiency of evidence.

[6] *Lock v. State* (1966), 31 Wis. 2d 110, 114, 142 N. W. 2d 183, and cases cited therein.

3. *New trial in the interest of justice.* In *Lock v. State,*[7] we also stated the rule governing the granting by this court, pursuant to its discretionary power under sec. 251.09, Stats., of a new trial in the interest of justice in a criminal case:

". . . it should clearly appear from the record that for some reason it is probable there has been a miscarriage of justice. In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial."

There is no question but that Schiller was confused in his stories about what happened. He gave pretrial statements inculpating Zillmer, others exonerating him; at the trial Schiller implicated Zillmer and he reaffirmed this testimony after he signed his two "recanting" post-conviction affidavits. The jury had all the witnesses before it and it chose to believe Schiller's trial testimony. Our conviction that justice has not miscarried is buttressed here by the fact that the trial court conducted an extensive postconviction hearing and denied relief to the defendant.

4. *Misstated testimony.* During the cross-examination of Charles Erwin, the young attendant at the Clark station, testimony was elicited that Erwin described Schiller's eyes as "bloodshot and kind of glassy." Erwin did not testify that he had seen Zillmer's eyes.

During the cross-examination of Zillmer, the district attorney incorrectly stated that Erwin had testified that Zillmer's eyes were "glassy." Several other questions were asked regarding Erwin's observations before the prosecutor began to pursue a different line of exploration.

It should be noted that this misstatement was concededly unintentional. This was a long trial. Erwin was

---

[7] *Supra,* footnote 6, at page 118.

questioned on March 14, 1966. Zillmer was cross-examined three days later, on March 17, 1966. The testimony between the two dates consumed 568 pages of the transcript. At the most, the prosecutor was merely incorrectly assuming facts not in evidence. This was no more than a mistake—just like defense counsel's mistake during oral argument in this court in describing the prosecutor's question to Zillmer as including "glassy and bloodshot" when in fact it was only "glassy."

Any error committed by the prosecutor, however, would appear to be harmless. The district attorney did not directly indicate that Zillmer was looking into the station. This was a minor error in a long and bitterly contested trial and its absence would have had no effect on the outcome of the case. The error was harmless beyond a reasonable doubt. Furthermore, no objection was made to this testimony, thus the trial court and the district attorney were not afforded an opportunity to correct the error. To consider it for the first time now would be unfair to the state.

5. *New hearing.* The defendant asks this court for an order directing the trial court to conduct a new postconviction hearing. The reason for this request is that Zillmer would like to call three new witnesses at the new hearing who would testify that Schiller told them he had "framed a cop." The three witnesses, all inmates of Green Bay reformatory, allegedly heard Schiller make the claim. Schiller denied having made the claim, or more appropriately, the boast. Whatever the dubious probative value such additional testimony would have, because it is basically a repeat of the statements contained in the affidavits, it would be cumulative evidence at most. Zillmer has had a fair hearing and a new one is not ordered.

*By the Court.*—Judgment and order affirmed.