STATE, Respondent, v. HAUGEN, Appellant.

*No. State 4. Argued November 30, 1971.—Decided January 4, 1972.*
(Also reported in 193 N. W. 2d 50.)

For the appellant there was a brief by *Robert M. Sigman* and *Sigman, Sigman & Shiff,* all of Appleton, and oral argument by *Robert M. Sigman.*

For the respondent the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, and *William A. Platz,* assistant attorney general.

ROBERT W. HANSEN, J.   Two young men, Roger Haugen and John Ball, traveled from Milwaukee to Shiocton, and it is the variance in their testimony as to what they did together in Shiocton that creates the issue of fact in this case. Both agreed in their testimony that they had been drinking together in Milwaukee and decided to hitchhike to Amherst. They got as far as Shiocton where they spent the evening of May 10, 1970, visiting and drinking in taverns. During that same evening a restaurant-sporting goods store was broken into and burglarized. (Seven pistols and about $10 in coins were stolen.) Early in the morning of May 11, 1970, John Ball was found to have some of the stolen property in his possession, admitted burglarizing the store but stated he would not implicate Roger Haugen and would not testify against him. Later that morning, Roger Haugen was arrested while talking with a local resident and charged with burglary. He denied participation in the burglary.

The testimony of John Ball was that the two of them, Haugen and Ball, had broken into the restaurant-sporting goods store and stolen the pistols and coins. He

testified that they cached the stolen pistols and coins near some farm machinery. (Ball had two pistols and some of the coins on his person when arrested.) Reasonable inferences may be drawn by a trier of fact from physical facts and surrounding circumstances. Such support or corroboration of the believability or credibility of Ball's account of what happened can derive from the fact of two friends or companions drinking together in one city, deciding to hitchhike together to a distant community, stopping en route and continuing their drinking and tavern visiting in the city in which the burglary occurred. It is not impossible that one of the two would interrupt the joint nature of the traveling and socializing to slip off and burglarize a store all by himself, but the comparative reasonableness of such alternative inference was for the trier of fact to determine.

The testimony of Roger Haugen was that he did not in any way participate in the burglarizing of the store. In support of his testimony, and his right to have it believed, defendant pointed out that he had no "loot" on him when arrested. He pointed to his on-the-spot denial of involvement when placed under arrest. He noted that he was arrested in broad daylight while conversing with a local resident, claimed that staying around the town after the crime was committed was behavior inconsistent with participation in it. That is an inference that can be drawn, but, obviously, not the only possible inference. The same is true of the emphasis placed upon his going around the town shouting for his companion, Ball. Unless both could leave together, there are some reasons for neither electing to leave alone. It is not an unreasonable inference that staying around could be calculated to disarm suspicion or, at least, to be the only way of determining what had happened to one's companion. Additionally, defendant stressed that the clothing he wore, taken from him hours after the commission of the

crime and after he had been wandering about in the rain, was sent by the police to the state crime laboratory for microscopic examination. There was new wax on the store floor, and Ball had testified that Haugen broke the store window to enter by hitting it with a sweater-wrapped arm. The claim is that the crime laboratory examination must have revealed an absence of wax on the shoes and glass particles in the sweater. However, there is no proof in this record that the state laboratory ever made a test, nor as to the results of any test. The gap could have been bridged by defendant's trial counsel subpoenaing the state laboratory director to determine if a test was made, and what it proved. The record gives no basis for finding either that a test was made or that the results were favorable to the defendant.

Greatest reliance is placed upon attacking the believability of John Ball's testimony. One basis of attack is upon his being intoxicated; however, he testified: "I was pretty drunk; but, I know what happened." The explicitness of his recollection of exactly how the burglary was committed certainly makes degree of intoxication a matter of credibility and an issue of fact for the jury. The sharpest assault upon Ball's testimony relates to his initial confession in which, according to the police officer, he refused to implicate Haugen and stated that he would not testify against him. (At the trial, Ball testified he had implicated Haugen "in a roundabout way" in his initial statement to police.) It is not disputed that it was two or three weeks after the commission of the crime that Ball did fully implicate Haugen in the commission of the burglary. He sought to borrow $200 from Haugen to assist him (Ball) in retaining counsel for his defense. As Haugen phrased the circumstances of their discussion of such loan, ". . . Well he told me that if I didn't have two hundred dollars to borrow him, so he could get a lawyer, he would have to implicate me." The tardiness of memory, or delay in naming Haugen as

a partner in the crime, does go to the credibility of Ball's testimony. It is a reasonable inference that his initial refusal to "implicate" Haugen was because Haugen was innocent rather than the refusal of a pal to squeal on his partner. It is a reasonable inference that his subsequent naming of Haugen as coparticipant was an expression of anger or disappointment in not getting a loan to help secure trial counsel rather than a feeling that he ought no longer protect a partner in crime who would not assist his defense. However, the inference, among those apparently reasonable alternatives, to be drawn was here for the jury to draw.

It is clear the jury believed the testimony of John Ball, supported by some of the surrounding facts and circumstances, but weakened by other facts in this record. It is as clear the jury did not believe the testimony of Roger Haugen, supported by some, but not all, of the surrounding facts and circumstances. The issue is one of comparative credibility, and in this state the jury had ". . . great latitude in determining the credibility of the witnesses and the weight of the testimony. . . ." (*State v. Richardson* (1969), 44 Wis. 2d 75, 77, 170 N. W. 2d 775.) Also, the trial court, which shared with the jury the opportunity to observe the witnesses on the witness stand, their demeanor and manner of testifying, by denying motions after verdict, found that the jury could ". . . acting reasonably, be convinced beyond reasonable doubt of such guilt from the evidence . . . ." (*State v. Richardson, supra,* at page 77.)

On the appeal in a criminal case of a jury verdict and court judgment, an appellate court is not to sit itself in a successor jury box and decide what verdict it would or could agree upon on the testimony offered. This would substitute the cold type of a transcribed record for the whole process of question-and-answer, action-and-reaction and words-plus-demeanor that constitute a trial. It is the inherent limitations of dependence upon transcript

and argument that has led this court to state that: " '. . . The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt . . . .' " (*State v. McCarty* (1970), 47 Wis. 2d 781, 790, 177 N. W. 2d 819); and that ". . . only when the evidence that the trier of fact has relied upon is inherently or patently incredible that the appellate court will substitute its judgment for that of the fact finder, who has the great advantage of being present at the trial." (*Gauthier v. State* (1965), 28 Wis. 2d 412, 416, 137 N. W. 2d 101, certiorari denied, 383 U. S. 916, 86 Sup. Ct. 910, 15 L. Ed. 2d 671.) We cannot hold that the testimony supporting conviction in this case is inherently or patently incredible. Even if it were to be considered entirely uncorroborated testimony of an accomplice to a crime, it would be ". . . competent evidence upon which to base a verdict of guilty if it is of such a nature that it is entitled to belief and the jury believes it. . . ." (*Sparkman v. State* (1965), 27 Wis. 2d 92, 95, 133 N. W. 2d 776.) Here, as in a recent case, there was at least the ". . . circumstantial evidence from which the jury could conclude that [the accomplice] and the defendant were together during the earlier part of the evening when the burglary took place." (*Jandrt v. State* (1969), 43 Wis. 2d 497, 503, 168 N. W. 2d 602.) Using the language of the *Jandrt Case,* we conclude: "After reviewing the entire record, we are satisfied that the accomplice's testimony . . . is not incredible and that the jury could have believed what the accomplice said . . . ." (*Id.* at page 502.) The trial court in this case instructed the jury: ". . . ordinarily it is unsafe to convict upon the uncorroborated testimony of an accomplice; and, therefore, you should examine the evidence with the utmost care and caution; scrutinize it closely and weigh it in the light of all the attending circumstances as shown by the whole evidence. . . ." That points out the perils and

counsel's caution in evaluating the testimony, uncorroborated, of an accomplice to a crime. But it did not require the jury to disbelieve the testimony of John Ball. Believing that testimony, in the light of all surrounding circumstances, the jury was entitled to return a verdict of guilty.

*By the Court.*—Judgment affirmed.