ROHL, Plaintiff in error, v. STATE, Defendant in error.

*No. State 116. Argued November 1, 1974.—Decided November 26, 1974.*
(Also reported in 223 N. W. 2d 567.)

686

For the plaintiff in error there were briefs and oral argument by *Ron A. Kaminski* of Manitowoc.

For the defendant in error the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

CONNOR T. HANSEN, J.

The victim, Mrs. Mary Glander, an elderly lady, resided at 1010A South 12th Street, Manitowoc, Wisconsin. On July 10, 1972, at approximately 2 p. m., Mrs. Marguerite Reitmeyer, who occupied the lower half of the duplex at the same address, discovered the victim's body. Mrs. Reitmeyer entered the victim's apartment through the open rear door, having found the front door locked. When she entered the apartment, she saw smoke and the victim's body was on the day bed. She immediately called the fire department.

Captain Daniel Andrastek of the Manitowoc fire department arrived at the scene shortly after being called. He testified that he found the nude body of the victim on the day bed, an apartment full of smoke and heat, charred paper and remains and evidence of two fires in the apartment. James Powers, the county coroner, arrived on the scene shortly before 3 p. m. and pronounced the victim dead.

William D. Rossiter, director of the state fire marshal bureau, investigated the incident and testified that there were two different fires in the apartment and that, in his opinion, there was no question that the two fires had been set intentionally by human hand.

Dr. John Fodden, a pathologist who performed the autopsy on Mary Glander, testified that she had sustained a deep wound above the right ear which was produced by a severe blow to the head; that she had a similar injury to her lower lip; that she had bruises on her neck, arms and chest area, several broken ribs; and that she had internal hemorrhages in her head, neck and chest, especially near her lungs and in the muscles of her heart. He testified that, in his opinion, the death was due to hemorrhaging in the heart muscles with concussive brain damage and loss of blood being ancillary causes. The doctor also testified that the victim was alive when the fires were started, as evidenced by the manner and degree to which she was burned. Further, the doctor testified that the blows leading to death were delivered by a firm but resilient object such as a bag filled with sand, or the ball or heel of a person's foot. The doctor testified that, in his opinion, the injuries could not have been caused by a wooden pole. Finally, the doctor fixed the time of death as somewhere between 4 and 6 a. m., July 10, 1972, and stated that the victim probably did not live longer than an hour after receiving the blows.

An important witness in the trial was Sue Nelson, age thirteen, who was called as a witness on behalf of the state. Miss Nelson was granted immunity at the request of the state pursuant to sec. 972.08 (1), Stats., from prosecution or penalty that might have been imposed as the result of her testimony. Miss Nelson's testimony was treated as that of an accomplice and the trial court so instructed the jury with appropriate instructions as to her credibility.

Miss Nelson testified that on the date of the crimes, July 10, 1972, she left her house at about 2 a. m. She walked over to the Rosinsky house where she met the defendant, Randall Rohl (a/k/a Randy Rosinsky), his brother, Marvin Rosinsky (a/k/a Marvin Rohl), and his

sister, Cindy Rosinsky. She arrived at the Rosinsky house at approximately 2:20 a. m. She testified that she came to the house in response to a telephone call from Marvin some time earlier. The four people left the Rosinsky house at approximately 2:30 a. m. and proceeded to a park directly across from the Glander residence. The defendant, according to Miss Nelson, was carrying a flashlight and a wooden pole. Cindy and Miss Nelson were told to wait in the park and the defendant stated he hoped " '. . . she [Glander] is still in the hospital and not home.' " Sue Nelson testified that she had told Marvin that Mrs. Glander was in the hospital sometime in June. The defendant, carrying a flashlight and pole, and Marvin went across the street and into the downstairs front entry of Mrs. Glander's residence. The defendant and Marvin remained in the house approximately twenty minutes, or from about 2:45 to 3:10 a. m., according to Miss Nelson's timetable, and that when she next saw them they were on the side of Mrs. Glander's building, laughing. As they approached, Miss Nelson noted that they still had the pole, which looked like it had blood on it, but that they did not have the flashlight. Miss Nelson described the clothing the brothers were wearing. She also testified that the four of them remained in the park for about five minutes during which time the defendant stated, " 'We knocked her down and we killed her.' " The defendant then gave the pole to Marvin, who gave it to Miss Nelson. The four of them returned to the Rosinsky house where they remained an additional five minutes. During this time Marvin gave Miss Nelson two rings, a bracelet, a necklace and $53, and Miss Nelson gave the pole back to Marvin. Sue Nelson then returned to her home, arriving between 4 and 4:30 a. m. Some two weeks later, the defendant's mother gave her the pole, which she then gave to a friend, Dennis St. John, along with the jewelry and the money.

The defendant, in addition to offering evidence attacking the credibility of the testimony of Sue Nelson, offered alibi evidence to show that he was at a bar and a party the night of the crime. The defendant testified that he went to a movie early in the evening of July 9, 1972, and that he then went to Lang's Lounge where he remained until 2 a. m., July 10, 1972. He testified that he was then asked to a party at Gerald Nechodomu's where he remained continuously until after 4:30 a. m. He related that at the party a girl named Dawn Martz had become ill and he had helped her. He testified that he tried to take someone's wallet while at the party, and that he was chased out of the party and down the street for attempting to do so. After eluding his pursuers, he returned home. He also stated that at his brother's trial he had testified that he had gone to a movie with his brother that night, but that they had both gone home immediately thereafter. He testified that his former statement was a lie which he made up because Miss Nelson was lying to convict his brother, and that he feared that if he told the police he was on the street at 4:30 in the morning they would have blamed him for the crime.

Defendant then called two witnesses, Michael Lang, the manager of Lang's Lounge, and William Brault, a bartender there, who confirmed that the defendant had been in their bar until 2 a. m. on July 9, 1972. Six additional witnesses, Steve Thomas, Bruce Stelzer, Gary Kunz, James Frisch, Michael Schumacher and Gerald Nechodomu, all of whom were at the alleged party, were called by the defense and testified so as to confirm that; a party had been held, that Dawn Martz had been present and had gotten sick; that the defendant had been present until after 4 a. m.; and that he had been chased out of the party after he had tried to steal a wallet. However, none of these witnesses were able to state on what day the party occurred. There was testimony that Stelzer

and Schumacher reported the attempted theft of the wallet to the police officers Duveneck and Kocourek. The two officers denied getting such a report.

The defense further called Dawn Martz who testified that she attended only one party at which the defendant was present and that she was sure that it was the night in question. She remembered the night because she broke up with her boyfriend later that week and that they were able to get back together just before the following Saturday, July 15, 1972, when her boyfriend returned to Germany. She also testified that she and her boyfriend had gone out with his mother and a friend earlier in the evening and that they had started drinking at Hansen's Happy Hour, another bar in Manitowoc.

In rebuttal, the state called Beverly Kerwin, the mother of the boyfriend of Dawn Martz. She testified that she had not been at Hansen's Happy Hour with her son and Dawn on July 9, 1972, but that she had been there with them on either July 3 or 4, 1972. The state also called Marlene Budsberg who testified that she was at the party testified to by the defense witnesses, but that it could not have been on July 9, 1972, or the morning of July 10, 1972, because she never went to a party when she had school the next day. July 9, 1972, was a Sunday. In post-trial proceedings the defendant unsuccessfully attempted to prove that Marlene Budsberg recanted this testimony after verdict and judgment.

The defendant raises the following issues on this review:

1. Can the conviction stand upon the uncorroborated testimony of an accomplice?

2. Is the evidence sufficient to support the conviction?

3. Should the trial court have suppressed the testimony of the defendant given at the trial of his brother?

4. Did the application of the alibi statute to defendant have a prejudicial effect on the outcome of the case?

5. Should a new trial be granted in the interest of justice?

*Uncorroborated testimony of accomplice and sufficiency of evidence.*

The defendant asks this court to re-examine the well-established rule that in this state a jury can convict upon the uncorroborated testimony of an accomplice. This same argument has been made in several cases in the last few years and in each instance this court has declined to alter the rule. Most recently, the state public defender has made the argument, citing virtually the same authority from the same foreign jurisdictions, in *Sass v. State* (1974), 63 Wis. 2d 92, 216 N. W. 2d 22, and *Rohl v. State, supra.*

In the *Rohl Case,* page 449, this court quoted approvingly from the *Sass Case,* pages 95 and 96, as follows:

" '. . . On this record we should decline, if there were no other defects, to re-examine the rule that unsubstantiated testimony of an accomplice is sufficient to sustain a conviction without corroboration. Sass hopefully asks this court to require some corroboration of testimony of an accomplice and claims in part corroboration is required by *Sparkman v. State* (1965), 27 Wis. 2d 92, 133 N. W. 2d 776. Sass misreads *Sparkman.* If an accomplice's testimony is partly corroborated by physical facts or other testimony, such evidence makes the accomplice's testimony more credible but the present rule is that uncorroborated testimony of an accomplice does not need corroboration to be sufficient to sustain a conviction if the finder of the fact finds the testimony credible. This question is not a constitutional or jurisdictional one and consequently was outside the scope of the postconviction remedy of sec. 974.06. Although the trial court denied the motion on its merits, it should have dismissed the petition as being an inappropriate remedy to raise the issue.' "

This court further stated in the *Rohl Case,* pages 449, 450:

"We are not persuaded that we should now accept the same argument we considered and rejected less than ninety days ago. The rule remains—a conviction can be sustained upon the uncorroborated testimony of an accomplice."

We again state that we decline to change the rule. However, the record in this case reflects that the testimony of Miss Nelson is not uncorroborated.

Dr. Fodden, the pathologist, testified that the death occurred somewhere between 4 a. m. and 6 a. m. on July 10, 1972. He further testified that death would have ensued not more than one hour after Mrs. Glander suffered the blow to her chest. This would put the time of the beating between 3 and 5 a. m. Miss Nelson's testimony placed the defendant at the scene of the crime between 2 :45 and 3 :10 a. m.

Mrs. Glander's son, Fred Glander, testified that when he left his mother's apartment at 9 :30 p. m. on the evening of July 9, 1972, he checked the back door, making sure it was locked, and then left through the front door which was unlocked. Although his wife, Lorraine Glander, further testified that it was his mother's habit to hook the front door from the inside, Detective Richard Brey of the Manitowoc police department testified that there were no signs of forcible entry in the apartment. Mrs. Reitmeyer, who discovered the crime the next day, testified that she found the front door of the apartment hooked from the inside and the back door open. Mrs. Reitmeyer further testified that the downstairs outside doors to both the front and rear entries were never locked. Miss Nelson testified that she saw the defendant and his brother go in the front entry and return by the side of the house.

Sue Nelson also testified that the defendant mentioned a previous robbery of the same person which occurred a year earlier. This testimony is corroborated by the testimony of Lorraine Glander that the victim had been robbed before.

The defendant also argues that the testimony of Dr. Fodden that a wooden pole could not have caused the injuries to the victim refutes Miss Nelson's testimony concerning the pole. Miss Nelson, however, never testified that the pole was the murder weapon, but merely that "[i]t looked like it had blood on it."

The defendant also points to the fact that none of the allegedly stolen articles, as testified to by Miss Nelson, were produced at the trial, and that there was no evidence establishing that all of the items Miss Nelson said she received were missing from the Glander apartment. The first contention is explained by the fact that, despite a search of Dennis St. John's residence, none of the articles testified to by Miss Nelson was ever recovered by the police. St. John denied ever receiving the property from Miss Nelson, as might be expected in view of the fact that they would have been stolen property, thereby making him a party to the crime. The second contention lacks merit due to the uncertainty of Fred and Lorraine Glander's testimony as to exactly what was missing from Mrs. Glander's apartment. The only definite testimony in this regard was that Lorraine Glander had cashed Mrs. Glander's social security check of $65 for her on Saturday, July 8, 1972, and that Mrs. Glander put the proceeds in her purse. A purse was found open and empty on the floor of the apartment when the crime was discovered two days later, and Miss Nelson testified that she received $53 from the defendant and his brother the night of the crime. The testimony of Sue Nelson is corroborated in other respects.

Other things pointed to by the defendant, such as the testimony as to Miss Nelson's reputation as a liar, the

failure of the state to produce the bloody shirt, the inconsistent statements made by Miss Nelson to other people, and the conflict between Miss Nelson's testimony and that of alibi witnesses for the defendant all go to the weight of the testimony.

This court has held that the determination of witnesses' credibility and the weight to be accorded conflicting testimony are properly a function of the trier of facts. *Banks v. State* (1971), 51 Wis. 2d 145, 153, 186 N. W. 2d 250; *Rohl v. State, supra,* pages 451, 452; *State v. Haugen* (1972), 53 Wis. 2d 339, 344, 193 N. W. 2d 50.

This court has defined "incredible evidence" as evidence "in conflict with the uniform course of nature or with fully established or conceded facts." *Simos v. State* (1972), 53 Wis. 2d 493, 495, 496, 192 N. W. 2d 877. After reviewing the record, we conclude there was sufficient credible evidence to support the verdict.

The defendant asserts that the evidence was insufficient to prove the necessary intent for first-degree murder. In *State v. Wells* (1971), 51 Wis. 2d 477, 483, 484, 187 N. W. 2d 328, this court held that in the absence of evidence to the contrary, he who takes the life of another by the infliction of a wound naturally and probably calculated to produce death is presumed to have intended that result and to be guilty of murder of the first degree. In the present case there is no evidence to the contrary. Dr. Fodden testified that the injuries sustained by the victim could not have been caused by a fall unless from a height of from one to two stories, nor could they have been self-inflicted, but that to a reasonable medical certainty they were caused by a forceful blow. Further, Sue Nelson testified that when the defendant came out of the Glander residence he stated, " 'We knocked her down and we killed her.' " From this testimony and other evidence, the jury could find that the defendant killed Mrs. Glander with the requisite intent.

Defendant also contends that there was insufficient evidence for a conviction on the charges of robbery and arson. The basis for this contention is the assertion that the defendant cannot be convicted on the strength of Miss Nelson's testimony alone. For the reasons given above, this contention is without merit.

Defendant further draws this court's attention to an attempted recantation by Miss Nelson of her testimony. This issue is exactly the same as that argued in *Rohl v. State, supra.* It pertains to the exact same post-trial transcript of a conversation between Miss Nelson and Attorney Kaminski. This court's rejection of the argument in that case is controlling here.

Unlike the *Rohl Case, supra,* there is an additional attempted recantation in this case by Marlene Budsberg, one of the state's rebuttal witnesses called to refute the alibi offered by the defendant. Miss Budsberg filed an affidavit with the trial court in which she stated that contrary to her testimony at trial, the alleged party could have occurred on a Sunday. However, she later filed another affidavit with the trial court in which she stated that the former affidavit was executed after she had been "embarrassed and harassed, in private and in public" by a witness who had testified on behalf of the defense. She then opined that her testimony at trial concerning the date of the party in question had been uncertain when given and was based on her assumption that the party could not have been on a Sunday because it was not her habit to attend parties on nights before school. Thus, her testimony at trial implied that she was uncertain as to the date and that the former affidavit was only meant to confirm that uncertainty.

In *Rohl v. State, supra,* page 453, this court quoted from *Nicholas v. State* (1971), 49 Wis. 2d 683, 694, 183 N. W. 2d 11, stating the current rule relating to recantations as follows:

" 'In *Zillmer v. State* (1968), 39 Wis. 2d 607, 616, 159 N. W. 2d 669, this court reiterated with approval the already well-established rule that a new trial may be based on an admission of perjury only if the facts in the affidavit are corroborated by other newly discovered evidence. Here the defendant is unable to point to any "other newly discovered evidence" which would corroborate the affidavit of William Ashford.

" 'We conclude that recanting affidavits, standing alone, are of no legal significance.' "

It does not appear that there is any other newly discovered evidence which corroborates the facts in Miss Budsberg's first affidavit. On the contrary, if that affidavit is true, then Miss Budsberg merely becomes one more witness who would testify that the party occurred but that she is uncertain of the date.

In the *Rohl Case,* this court stated that the trial court is in a much better position to resolve the credibility and the weight to be given a recanting statement. In reference to the affidavit of Miss Budsberg, the trial court denied the motion for a new trial and stated:

"The story of Marlene Budsberg is disturbing in many respects. One, she does back away from some of the things that she said on the trial and she also again affirms a situation that was present all through this trial involving almost, not everybody, but a number of people, that she says that since the trial your affiant has been embarrassed and harassed in private and in public by a witness who testified on behalf of the defense and as a result of such embarrassment and harassment, she does thus and thus. And that has been going on repeatedly. Not everybody, but a number of people who took the stand and testified in this trial reported that subsequently they were contacted by people who were interested in the defense, and to use this girl's words, 'harassed' about their testimony, and it seems to me that there has been a full, fair disclosure of all the facts here."

We are of the opinion that the evidence that could have been relied upon by the jury was neither patently nor

inherently incredible. The evidence adduced, believed and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *Rohl v. State, supra,* pages 452, 454; *Voigt v. State* (1973), 61 Wis. 2d 17, 20, 211 N. W. 2d 445.

*Suppression of former testimony.*

Defendant contends that he was denied the effective assistance of counsel because both he and his brother were represented by the same attorney at the time of Marvin's trial. The defendant testified at that trial that he and his brother had gone to a movie on July 9, 1972, and had then gone home and to bed. After a pretrial hearing on a motion to suppress, the trial court determined that the defendant's testimony at his brother's trial, as it related to this issue, was admissible. The result of this determination by the trial court was that on direct examination the defendant testified that the testimony he gave at Marvin's trial was a lie. At the instant trial, the defendant testified that he had gone to Lang's Lounge and the subsequent party on July 9, 1972.

The defendant further asserts that there was an actual conflict of interest between himself and his brother, known to both the attorney and the court, because Miss Nelson had given a statement to the police which included an alleged remark by Marvin that he had nothing to worry about ". . . because Randy did it." Defendant relies primarily on *Campbell v. United States* (D. C. Cir. 1965), 352 Fed. 2d 359, which stated that the trial court has a duty to assure that a codefendant's decision to proceed with one attorney is an informed decision especially where a conflict of interest presents itself.

The defendant's position is without merit. This court has held that one attorney may represent two defendants charged with participation in the same crime unless the

interests of the defendants are shown to be in conflict.[1] *State ex rel. White v. Gray* (1973), 57 Wis. 2d 17, 31, 203 N. W. 2d 638; *Witzel v. State* (1969), 45 Wis. 2d 295, 298, 299, 172 N. W. 2d 692; *Curry v. State* (1967), 36 Wis. 2d 225, 229, 230, 152 N. W. 2d 906. Further, it is necessary that the defendant show the existence of the conflict of interest by clear and convincing evidence. *Curry v. State, supra.*

The *Campbell Case* is not in point. There the codefendants were being tried together and were represented by one court-appointed attorney. The case against one defendant was strong, but against the other the state placed its reliance on a statement by the codefendant that he and the defendant were together all evening. Other evidence indicated that the crime could have been committed by one person. *Campbell v. United States, supra,* page 360.

In the present case, unlike the *Campbell Case,* there has never been a question as to whether only one of the brothers committed the crimes. The testimony of Sue Nelson was that both the defendant and his brother committed the crimes. The defense of both brothers has consistently been that Miss Nelson is wrong and that neither brother was present when the crimes were committed. At Marvin's trial, the defendant, by this testimony, attempted to exculpate both him and his brother. Following Marvin's conviction, defendant on his own trial attempts to exculpate himself with a different alibi. We find no conflict of interest between the defendant and his brother at the time of Marvin's trial, and that the defendant received effective assistance of counsel.

*Alibi statute.*

In *Allison v. State* (1974), 62 Wis. 2d 14, 214 N. W. 2d 437, this court, following the United States Supreme

---

[1] *See: Hall v. State* (1974), 63 Wis. 2d 304, 217 N. W. 2d 352.

Court decision of *Wardius v. Oregon* (1973), 412 U. S. 470, 93 Sup. Ct. 2208, 37 L. Ed. 2d 82, held sec. 955.07, Stats. 1967, and the last sentence of current sec. 971.23 (3) (a), unconstitutional. The basis of the holding was that it was a violation of a defendant's due process rights to require him to furnish the state with notice of an alibi and a list of the witnesses upon which he intended to rely to establish the alibi at trial without granting reciprocal discovery rights as to the witnesses the state intended to call in rebuttal. This court further held that the ruling would apply retroactively only as to defendants whose cases are not finalized and who attempted to put in alibi evidence despite not having given notice to the state under the statute. *Allison v. State, supra,* pages 28, 29.

The defendant in this case gave notice of alibi and supplied the state with a list of witnesses upon whom he intended to rely. No reciprocal list of rebuttal witnesses was given. Defendant requests that this court extend the retroactive effect of the *Allison Case* to cover this case on the ground that he should be made no worse off for complying with the statute and being prejudiced by its operation than a person who refused to comply with the statute and was prejudiced by its unconstitutional enforcement. Defendant claims that he was prejudiced in that one of the state's key alibi rebuttal witnesses, Marlene Budsberg, subsequently recanted her testimony, and that if defendant had had the requisite reciprocal discovery he might have been able to establish the uncertainty of Miss Budsberg's testimony at the trial, which might have led to a different finding by the jury.

We first observe that the defendant did not raise these issues with the trial court so that review in this court is not a matter of right. *Allison v. State, supra,* page 26. However, in view of *Wardius* and *Allison,* both decided subsequent to the trial here, we consider the defendant's claim.

The defendant's attempt to justify an extension of the retroactive rule adopted by this court in *Allison v. State, supra,* ignores the factors considered by this court in deciding whether, and to what extent, that rule should have retroactive application. In *Allison v. State, supra,* pages 27, 28, this court stated:

"The criteria for determining if procedural require-
ments affecting criminal prosecutions should be retro-
actively applied were discussed in *State ex rel. Johnson
v. Cady.* The court must consider (1) the purpose of the
rule, (2) the extent of reliance by law enforcement
authorities on the old rule, and (3) the effect on the ad-
ministration of justice of a retroactive application of
the new standard.
"The retroactivity of a decision is not automatically
determined by the provision of the constitution on which
the decision is based. 'Each constitutional rule of crimi-
nal procedure has it own distinct functions, its own
background of precedent, and its own impact on the ad-
ministration of justice, and the way in which these fac-
tors combine must inevitably vary with the dictate in-
volved.' . . ."

The defendant has failed to show adequate reason for departing from the previous decision of this court.

Furthermore, viewing the record in its entirety, we are of the opinion that the defendant was not prejudiced by the operation of the notice of alibi statute so as to warrant a reversal or new trial. In *Allison v. State, supra,* and *Wold v. State* (1973), 57 Wis. 2d 344, 204 N. W. 2d 482, this court has stated that error is harmless unless the result would reasonably have been different.

Unlike the defendants in *Wardius* and *Allison,* this defendant complied with the statute and was, therefore, permitted to present all the alibi evidence he wished. The defendant claims, however, that he was "surprised" by the testimony of Marlene Budsberg and, therefore, preju-
diced.

It is true that Marlene Budsberg might now testify that she is uncertain as to the date of the alleged party. It is

also possible that if the defendant had known of her testimony prior to trial, he might have been able to impeach her testimony. However, it cannot be said that either of these events would reasonably have led to a different result in the trial.

At least two other witnesses refuted the alibi testimony. One of these, Sue Nelson, was listed by the state in the discovery documents as a potential witness, and the other, Mrs. Beverly Kerwin, was listed by the *defense* as a possible witness. Further, the defendant relied heavily on the testimony of his witness, Elmer H. Scherer, chief of police for Manitowoc, who testified that Officers Kocourek and Duvaneck only worked on the same beat on July 9, 10, 11 and 13, 1972, to show that the party could not have occurred prior to July 9, 1972, as implied by the state's witnesses, because the attempted theft of the wallet at the party by the defendant was allegedly reported to those two officers while in the same squad car. However, Officer Kocourek, when called by the defendant, denied any knowledge of a report of the alleged theft to him. Miss Budsberg testified that she had been told of the attempted theft by the two men who had allegedly chased the defendant, but that they had only mentioned reporting the incident to one police officer. This part of her testimony was not mentioned in either of her post-trial affidavits and presumably would still stand.

Based on a complete review of the record, there is no reasonable basis for concluding that a different result would be reached even if all of the testimony of the witnesses unknown to the defendant prior to trial had been excluded. Therefore, even if we were inclined to extend the retroactive rule of the *Allison Case,* which we are not, we would have to conclude that the effect of the notice of alibi statute in this case was harmless error. *Allison v. State, supra.*

*New trial in interest of justice.*

In order to grant a new trial in the interest of justice under sec. 251.09, Stats., this court must be convinced, viewing the record as a whole, that there has been a probable miscarriage of justice or that a new trial would lead to a different result. *Rohl v. State,* page 455.

A complete review of the record in this case fails to disclose a basis for believing that justice has miscarried or that a new trial would lead to a different result. Therefore, the request for a new trial in the interest of justice is denied.

*By the Court.*—Judgment and order affirmed.