STATE, Respondent, v. MEDRANO, Appellant.

*No. 76–114–CR.   Argued March 8, 1978.—Decided June 30, 1978.*
(Also reported in 267 N.W.2d 586.)

12

For appellant there were briefs by *Thomas J. Balistreri* and *Shellow & Shellow,* and oral argument by *William Burke* all of Milwaukee.

For respondent the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

BEILFUSS, C.J.   After a party at a farmhouse near Plymouth, Wisconsin on the evening of November 16–17, 1974, two of the guests, Diane Kenealy and Cynthia Miller, reported to authorities that they were forced to partake in numerous acts of sexual intercourse and sexual perversion.   David Peter Medrano was charged with raping each of the women, and tried with five other defendants who were charged with raping or performing acts of sexual perversion with one or both of the women.

On this appeal Medrano contends the trial court erred in admitting hearsay testimony and evidence regarding a gun in Medrano's possession and in preventing the defense from offering testimony regarding a prior act by Diane Kenealy.   Medrano alleges that he was prejudiced when the jury heard that a third woman who had sexual intercourse at the party also had an abortion. Finally, Medrano argues that he was denied effective representation by counsel because his attorney also represented two other defendants whose interests conflicted with Medrano's.

Kenealy and Miller testified that around 9 p.m., a kangaroo court composed of several men convened in the kitchen and found Miller guilty of spilling beer in the living room.   Two men carried Miller from the living room to the bedroom in the back of the kitchen on the first floor of the farmhouse where she was forced to partake in ten to twenty acts of sexual intercourse and about eight acts of oral intercourse.

The kangaroo court later found Kenealy guilty and she was taken to an upstairs bedroom where she was forced to partake in at least four acts of sexual intercourse with four different men.   At approximately 2:30 or 3 a.m., she managed to escape and, while being pursued by men and dogs, she ran through a field to another farmhouse. During her flight she ran through tall grass, a cornfield and a dirtfield and she lost her shoes.   She was given

shelter at the second farmhouse, the home of Alfred Bruggink and his family.

Medrano first contends that the trial court erred in admitting, through the testimony of eight other witnesses, out-of-court statements that the victims and a third woman had been raped at the party. Medrano argues that the statements were admitted in violation of the hearsay rules and that he was denied due process by the cumulative effect of the eight extra witnesses testifying that the two victims had been raped.

The first state witness was Sheboygan County Deputy Sheriff Dennis Luedtke who was dispatched to the Bruggink farm at approximately 3:30 a.m., on November 17, 1974. He testified that he arrived at the house and was introduced to Diane Kenealy. When he asked what the problem was she said that she had been to a party and had been raped. Medrano's attorney joined the attorney for another defendant in objecting to this statement on the grounds that it was hearsay. The trial court overruled the objection. Luedtke then reported that Kenealy had told him that she had left her residence in Milwaukee at about 7 p.m., to go to the party and at the party was a group of people she believed to be members of a motorcycle gang because they were wearing black leather jackets and she heard some name mentioned like the "American Breed" motorcycle gang. She explained that she was put before a kangaroo-type court and was found guilty. At that point the attorney for another defendant objected to Luedtke reporting Kenealy's statements on the grounds of hearsay and asked that his testimony be stricken. However, the attorney said that he would withdraw his objection if the court instructed the jury that the statements were offered not as proof of the facts stated but merely as background. Medrano's attorney joined in the objection and moved for a mistrial. The court instructed the jury that the testimony received

through the officer relating to matters told him by Kenealy was received in evidence not to prove the truth of the various things she related but only to inform the jury that she related certain things to the police officer. The court had ruled that the testimony was being offered only to explain why the officer did what he did. After speaking with Kenealy, Luedtke and several other officers went to the first farmhouse and arrested eleven males and one female.

Medrano argues that it was error to permit Luedtke to testify to the details of Kenealy's story. Medrano admits that the deputy's testimony that Kenealy said that she had been to a party and had been raped was made without objection and argues that that testimony alone was sufficient to permit the jury to understand the reason for the subsequent activity of the police. Such testimony is permitted to explain the later action of the officer. *State v. Lopez,* 182 Kan. 46, 318 P.2d 662 (1957). However, Medrano argues that it was improper to permit Luedtke to relate the further details that Kenealy had reported to him. Medrano admits that these details only concern events leading up to the rape, and not details of the rape itself. The admission of these details was not prejudicial to the defendant's case because, with the exception of the reference to the mock trial, the other facts were admitted by the defendants. *Harris v. State,* 52 Wis.2d 703, 705, 191 N.W.2d 198 (1971).

Medrano contends that it was error for the trial court to permit three women to report Cynthia Miller's out-of-court statements. After the state called three law enforcement officials as its first witnesses, it called Cynthia Miller who related her version of the events of the party. Before the state completed its direct examination of Miller, her testimony was interrupted so that the state

could call three women to testify. Each of the three women testified that she talked to Cynthia Miller either late in the morning or during the afternoon of November 17, 1974, and that Miller related facts regarding the events of the party. Medrano now argues that Miller's out-of-court statements reported by the three women were hearsay and should not have been admitted into evidence. After the first woman began relating what Miller told her, one of the defendant attorneys objected but said he would have no objection if the jury was instructed. Medrano's attorney joined in the objection. After the court instructed the jury that the testimony was not being received into evidence to prove the truth of what Miller said but only to show that these things were in fact said, the other defense attorney withdrew his objection. Because Medrano's attorney had joined in the first attorney's objection, the withdrawal of the objection by the first attorney is deemed the withdrawal of the objection by Medrano's attorney also. By withdrawing the objection Medrano's attorney waived his right to challenge the admissibility of the evidence. *Bailey v. State*, 65 Wis.2d 331, 350, 222 N.W.2d 871 (1974).

No objection was made by Medrano's attorney when the other two women related their conversations with Miller. The failure of Medrano's attorney to object waived his right to contest the introduction of the evidence. *Bennett v. State*, 54 Wis.2d 727, 735, 196 N.W.2d 704 (1972).

Before Diane Kenealy testified, Alfred Bruggink and his daughter, Edith, reported that when Kenealy came to their house she told them that she had been raped. Medrano now argues that their testimony was in violation of the hearsay rules. At the trial the attorney for another defendant objected to Alfred Bruggink's report of what Diane Kenealy said. Medrano's attorney joined

in the objection. The court concluded that Diane Kenealy's statement to Alfred Bruggink was admissible as an excited utterance under sec. 908.03 (2), Stats.

Sec. 908.03 (2), Stats., authorizes the admission of out-of-court statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Diane Kenealy later testified that she arrived at the Bruggink farm after running through a field while being chased by men and dogs. Alfred Bruggink testified that he let Diane Kenealy in after hearing her knock on the window and yelling and begging to be let in. He said she had on jeans and a shirt, but no shoes and there was mud on her. She tried to call the sheriff's department but was too excited to make the call. He described her as hysterical. Edith Bruggink testified that Kenealy was hysterical, crying, shaking and nervous. The trial court correctly admitted the statements as excited utterances. The statements related to a startling event and were made while Kenealy was under the stress of excitement caused by the event.

On appeal, Medrano also objects to hearsay statements related by Sheboygan County Sheriff's Detective Eugene Simonsmeier. There were no objections to the statements and therefore Medrano's right to contest the admissions was waived. *Bennett, supra*, 54 Wis.2d at 735.

Dr. Irvin Schroeder examined Diane Kenealy on the morning of November 17, 1974. He testified that he was asked to examine her because she stated she was raped. Medrano now argues that Schroeder should not have been permitted to testify that Kenealy said that she had been raped. There was no objection to the statement when Schroeder offered his testimony; and thus the objection was waived. In addition, the testimony was proper be-

cause it was not offered for the truth of the statement but was offered to explain the reason for Schroeder's subsequent examination. *State v. Lopez*, 182 Kan. 46, 318 P.2d 662 (1957).

Medrano argues that even if the individual statements of the eight witnesses were not objectionable as hearsay, the effect of receiving the cumulative testimony of these witnesses subjected him to a trial by propaganda and denied him a fair trial in violation of his rights to due process. He argues that the repetition of the out-of-court statements served no legitimate purpose and acted only to unduly influence the jury.

None of the statements referred to any of the six defendants as a perpetrator of the crimes. In each instance, the hearsay statement was introduced for a legitimate purpose—either as an excited utterance or as background to explain the basis for some action taken by the witness—or there was no objection to the testimony when given. Several times the trial court instructed the jury that testimony was not being offered for the truth of the matter asserted but for other reasons. Defense attorneys approved of this instruction at that time. We conclude that Medrano was not denied due process by the introduction of the statements.

Medrano went to trial on an information charging him with two counts of rape and one count of carrying a concealed weapon. Medrano argues that the introduction of evidence of his possession of a pistol, which was completely unrelated to the charge of rape, prejudiced his defense to the rape charges and denied him due process.

Prior to trial, Medrano moved to sever the carrying a concealed weapon charge from the rape charges for purposes of trial. The court denied the motion. The court stated the presence of the gun appeared to be material to each and every one of the defendants because the

consent of a female in a rape or sexual perversion case was generally a crucial issue. The court told Medrano's attorney that if at trial it appeared that the gun evidence only related to a time after the completion of the various acts of alleged rapes and sexual perversion the evidence would not be admitted and that it would sever the gun charge. The court granted Medrano's attorney leave to renew the motion for severance at the time of trial.

At the trial, the third witness called by the state, Deputy Sheriff Kenneth DoBas, testified that he searched Medrano at the sheriff's department after Medrano had been arrested at the farmhouse and removed from Medrano's waistband a revolver loaded with six shells. Medrano's attorney objected to the questioning, arguing that the matter had been severed. The court stated that it had indicated in the past that severance was a possibility but that the matter had not yet been severed. No new motion for severance was made at that time. Following completion of cross-examination of DoBas, Medrano's attorney moved to sever the carrying a concealed weapon charge and the court decided to hold the motion in abeyance pending further testimony.

Diane Kenealy later testified that while Medrano was dressing, after having had sexual intercourse with her, she saw him pick up what looked like a gun from the floor and stick it in his pants. There was no objection by Medrano's attorney to the testimony about the gun.

Sheboygan County Sheriff's Detective James E. Hoffmann testified that he tested Medrano's gun and found that it was in working order. There was no objection to Hoffmann's testimony about the gun.

After Hoffmann's testimony and before the state called its last witness, Medrano's attorney moved to dismiss the carrying a concealed weapon count and, in the alternative, moved for severance of the charge. In response to a question from the court regarding the

testimony already on the record with reference to the weapon, Medrano's attorney stated that if the weapon charge was severed the testimony could stand on the record, but he asked the court to instruct the jury on the use of the evidence. The trial court severed the weapons charge and stated that he would not instruct the jury to disregard any testimony relevant to the gun.

Medrano argues that the admission of the evidence regarding the gun denied him due process. However, Medrano's right to contest the admission of the evidence regarding the gun was waived when his attorney permitted the testimony regarding the gun to stay on the record without objection. *Bailey, supra,* 65 Wis.2d at 350; and *Bennett, supra,* 54 Wis.2d at 735.

Medrano also argues that his trial on the rape charges should have been severed from the trial against the other defendants against whom evidence of fire arms was admitted. Prior to trial, Medrano's attorney had objected to consolidating his case with those of the other defendants at trial. The trial court permitted the consolidation but told the various defense attorneys that he would be amenable to motions to sever as they prepared their respective defenses.

One of the reasons the trial court permitted the evidence of Medrano's gun to remain on the record after the gun charge was severed was that Diane Kenealy testified that two of the defendants had sexual intercourse with her after she had seen Medrano put what looked like a gun in his waistband. According to the trial court, evidence of the gun was relevant to the charges against the two defendants who allegedly had intercourse with Kenealy after Medrano.

Medrano argues that his trial on the rape charges should have been severed at least from the trial as to

those two defendants so that he would not be prejudiced by the evidence of the weapon.

This court has stated that severance may be required when there would be presented at trial an entire line of evidence relevant to the liability of only one defendant. *State v. Shears,* 68 Wis.2d 217, 234–35, 229 N.W.2d 103 (1975). In *Shears,* quoting from *State v. DiMaggio,* 49 Wis.2d 565, 577, 182 N.W.2d 466 (1971), this court stated that when it appeared at trial that evidence applicable to only one defendant was being offered, the trial judge had an option to order severance at that time or to give the jury a cautionary instruction to the effect that evidence against one defendant may not be treated as evidence against all simply because they were being tried together.

In this case the trial court elected the option of instructing the jury. He told the jury to consider the evidence pertinent to each defendant separately and to judge the guilt or innocence of each defendant separately. The trial court's instructions to the jury provided Medrano due process.

Medrano also questions whether the trials against the six defendants should have been consolidated in the first instance. He points out that some defendants were charged with rape, others with sexual perversion. Some were charged with only one offense, others with two or more. Some were charged with offenses against one complainant, others with offenses against both women. He argues that although all offenses were alleged to have occurred during the same party, each offense involved a separate and distinct act at different times and in one of two different locations in the farmhouse.

Sec. 971.12(2), Stats., authorizes joinder of defendants:

"Two or more defendants may be charged in the same complaint, information or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting one or more crimes. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

Under this statute consolidation of the trial against the six defendants was proper. They are alleged to have participated in the same series of acts constituting one or more crimes. The statute specifically permits joinder of the defendants even where not all are charged as to each count.

Finally, Medrano argues that at least the trial court should have instructed the jury at the time the gun evidence was admitted that such evidence was not to be considered as proof of Medrano's guilt and was not admissible as to him.

We conclude that Medrano's interests were sufficiently protected when the court charged the jury prior to its deliberations that evidence against each defendant was to be considered separately and that the carrying a concealed weapon charge against Medrano had been severed.

Medrano argues that his defense was prejudiced beyond repair by hearsay testimony indicating that a woman who was neither a complainant nor a witness in the case had undergone an abortion because of forced sexual relations at the party. Detective Simonsmeier testified that Judy Feller told him that at the party she was taken to a bedroom and "forced to have sexual relations with people that she didn't wish to have." He was asked whether she told him anything else about her condition and he said that she had had an abortion. There was an objection to this statement and the court

instructed the jury that the answer was stricken and they were to completely disregard the answer. The court further told the jury:

"Whether someone did or did not have an abortion is completely irrelevant to the issues at trial in this case. It should have no reflection or no bearing whatsoever on any particular individual, certainly not to any of the defendants and certainly not as to the credibility of any witness."

Medrano contends that even though the statement was stricken and the jury was instructed to disregard it, the reference to abortion was so prejudicial that he is entitled to a reversal in the interest of justice. He also argues that it was reversible error for the trial court to refuse the defense's request to *voir dire* the jury to determine whether it was prejudiced by the statement.

We conclude that the evidence was not so prejudicial as to require a new trial. The main issue presented at trial by the testimony of the state and defense witnesses was whether the two victims consented to the sexual acts performed at the party, not whether the acts occurred. An abortion by Judy Feller might be relevant to whether acts had been performed, but not to consent. Whether Judy Feller had an abortion was collateral to the issues in the trial. Any prejudicial effect which might have flowed from the statement was cured by the court's immediate instruction to the jury to disregard the statement. *Harris, supra,* 52 Wis.2d at 706.

Medrano argues that the defendant should have been permitted to impeach Diane Kenealy by introducing evidence that five months before the party she had used someone else's baby in an attempt to obtain money from a man who had been responsible for her prior pregnancy. The defense made an offer of proof through Janice Therriault that in June of 1974 Kenealy said a man she knew

from Florida who had gotten her pregnant a couple years before was in town. Kenealy had had an abortion when she was pregnant and she wanted to use Therriault's two-year-old child in order to present her to the man as his child with Kenealy. Therriault said she was present when Kenealy presented the child and asked the man for money.

The defense wanted to use this to impeach Kenealy by showing that she had previously made false charges stemming from sexual conduct. In support of presenting this evidence the defense relied on cases which permitted cross-examination of a complainant regarding previous false accusations as to sexual conduct. *State v. Crabtree*, 237 Wis. 16, 296 N.W. 79 (1941), and Annot. 75 A.L.R.2d 508.

The court excluded the evidence on the grounds that it was not relevant to the issues involved in the case and, even if it were, the prejudice outweighed the probative value.

The trial court was correct in excluding evidence. Evidence of character of a victim is admissible only if it is evidence of a pertinent trait. Sec. 904.04(1)(b), Stats. Evidence that Kenealy fraudulently tried to obtain money from a former boyfriend five months prior to the party is not pertinent to whether she honestly accused Medrano of rape.

Medrano argues that he was denied effective representation by counsel because the attorney who represented him also represented two other defendants and was inhibited by a conflict of interest. Testimony of Diane Kenealy placed the other two defendants represented by the attorney, Robert Spaulda and Anton Hatzinger, at the mock trial that found Miller and Kenealy guilty. Also, Miller testified that Hatzinger tried to strangle her, poked her in the eyes and pulled her hair.

Neither Spaulda nor Hatzinger denied his presence at the party throughout the evening and the defense of each was that he did not commit the acts charged.

Medrano testified that he was gone from the party between 8 and 11 p.m., and that when he returned he performed an act of sexual intercourse with Kenealy with her consent. He denied having any sexual contact with Miller. Kenealy testified that Medrano forced her to perform sexual intercourse and Miller testified that Medrano had sexual intercourse with her without her consent while four people were holding her down.

The defense of each of the six defendants at trial was either that he did not perform the act charged or that he performed it with the consent of Diane Kenealy or Cynthia Miller.

On appeal, Medrano charges that a conflict of interest prevented his attorney from presenting his best defense. Medrano argues that his attorney should have admitted that force was used against the victims earlier in the evening but without Medrano's knowledge; and when he returned at 11 p.m., he had sexual intercourse with Kenealy not knowing that force had been used against her earlier. Medrano argues that conceding that force had been used earlier in the evening would have assisted his defense. He argues that because he would not have taken the nearly absurd stance that no force ever was employed against the complainants, the question in his case would have been, more reasonably, whether he himself used force, or whether he was the unwitting beneficiary of the force of others. He concludes that at least with this question posed there would have been some chance that the jury might have believed his more plausible story.

He points out that his attorney could not use this argument at trial because of its inculpatory effect upon Spaulda and Hatzinger. For the attorney to concede that force had been used earlier in the evening would be

almost to admit that they were involved in the use of force and were guilty.

Medrano argues that because his attorney was faced with an actual conflict of interest he is entitled to a new trial.

In order to establish that he was denied effective representation by counsel, Medrano must establish by clear and convincing evidence that an actual conflict of interest existed. *Hall v. State*, 63 Wis.2d 304, 311, 217 N.W.2d 352 (1974). It is not sufficient that he show that a mere possibility or suspicion of a conflict could arise under hypothetical circumstances. *Harrison v. State*, 78 Wis.2d 189, 201, 254 N.W.2d 220 (1977). However, Medrano does not have to show actual prejudice; once he shows an actual conflict he is entitled to relief. *Hall*, 63 Wis.2d at 311–312.

The fact that one attorney represents more than one defendant is not in itself a conflict of interest and the attorney is entitled to represent more than one defendant unless the interest of the defendants is shown to be in conflict. *Mueller v. State*, 32 Wis.2d 70, 77, 145 N.W.2d 84 (1966).

In the instant case, the positions of the defendants were not in conflict because each maintained he was innocent and each testified that no force had been used on the complainants during the evening. Thus, no showing of conflict of interest has been made. *See Holloway v. State*, 32 Wis.2d 559, 569, 146 N.W.2d 441 (1966).

Finally, Medrano requested a reversal of his conviction in the interest of justice. This court has stated:

"In order to grant a new trial in the interest of justice under sec. 251.09, Stats., this court must be convinced, viewing the record as a whole, that there has been a

probable miscarriage of justice or that a new trial would lead to a different result." *Rohl v. State,* 65 Wis.2d 683, 703, 223 N.W.2d 567 (1974).

In this case a review of the record fails to show any basis for finding a probable miscarriage of justice or that a new trial would lead to a different result.

*By the Court.*—Judgment and order affirmed.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). The majority correctly concludes on the basis of standards set out in our prior cases that Medrano did not establish that he was denied effective representation by counsel. However, after reviewing *Holloway v. Arkansas,* — U.S. —, 98 Sup. Ct. 1173, 55 L. Ed.2d 426 (filed April 3, 1978), and our prior decisions involving an attorney's representation of multiple defendants, I am concerned that the majority opinion does not emphasize the need for the attorney to avoid, wherever possible, multiple representation, and does not set forth the responsibility of the trial court to insure that defendants understand the risks of multiple representation.

The majority opinion repeats what we have often said: "The fact that one attorney represents more than one defendant is not in itself a conflict of interest and the attorney is entitled to represent more than one defendant unless the interest of the defendants is shown to be in conflict." Unfortunately this statement does not reflect the court's deep concerns and misgivings about multiple representation. Whenever there is multiple representation, there is the danger of conflict of interest. Therefore, the general rule which must guide the attorney is that the attorney should decline to act for more than one of several co-defendants.

Section 3.5(b) of the American Bar Association *Standards Relating to the Defense Function,* provides in part:

"The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation."

The Commentary to sec. 3.5(b) also emphasizes that lawyers should undertake multiple representation only in the rare circumstance in which such representation is clearly required.

". . . Although there may be some situations where it will be mutually advantageous to the defendants to have a single lawyer represent them, the risk of an unforeseen and even unforeseeable conflict of interest developing is so great that a lawyer should decline multiple representation unless there is no other way in which adequate representation can be provided to the defendants."

Similarly, the Code of Professional Responsibility does not explicitly proscribe multiple representation, but it strongly admonishes against the practice and urges lawyers to resolve all doubts against the propriety of multiple representation. Code of Professional Responsibility, EC 5-14 to 5-17, DR 5-101, 43 Wis.2d xlii-xlv.

If lawyers heed these admonitions, a case involving multiple representation should be a rare occurrence.[1]

If there is multiple representation, a question arises as to the duty of the trial judge to assure that criminal defendants are not deprived of their right to the effective

---

[1] For a proposal to interpret the Code to prohibit an attorney from representing multiple defendants in a criminal matter, see Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest & The Professional Responsibilities of the Defense Attorney*, 62 Minn. L. Rev. 119 (1978).

Mr. Justice Powell, in his dissenting opinion in *Holloway v. Arkansas*, — U.S. — —, n. 2 and text (April 3, 1978), summarizes the disadvantages of a rule prohibiting all multiple representation.

assistance of counsel guaranteed by the state and federal constitutions. Sec. 3.4(b) of the American Bar Association Standards *Relating to the Administration of Criminal Justice—The Function of the Trial Judge* places an affirmative duty on the trial judge in the event of multiple representation:

"Sec. 3.4(b) Whenever two or more defendants who have been jointly charged, or whose cases have been consolidated, are represented by the same attorney, the trial judge should inquire into potential conflicts which may jeopardize the right of each defendant to the fidelity of his counsel."

This court has neither accepted nor rejected the rule adopted by the *Standards* and by some courts[2] that the trial court has an affirmative obligation to ascertain whether defendants are aware of the potential risks involved in the multiple representation. *Harrison v. State,* 78 Wis.2d 189, 205, 254 N.W.2d 220 (1977). I believe the court should adopt such a rule and I urge the trial courts to assume this obligation in the interests of efficient judicial administration and the protection of the constitutional rights of defendants.[3]

---

[2] The federal courts of appeal have differed with respect to the scope and nature of the affirmative duty of the trial judge. *Holloway v. Arkansas,* — U.S. —, — (April 3, 1978).

[3] In *Campbell v. United States,* 352 F.2d 359 (D.C. Cir. 1965), the trial court's duty was described as follows:

"An individual defendant is rarely sophisticated enough to evaluate the potential conflicts . . . . Considerations of efficient judicial administration as well as important rights of defendants are served when the trial judge makes the affirmative determination that co-defendants have intelligently chosen to be represented by the same attorney and that their decision was not governed by poverty and lack of information on the availability of assigned counsel. We must indulge every reasonable presumption against the waiver of the unimpaired assistance of counsel." (at 360–61)